**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                            )
ADA H. MANTILLA,                            )
                                            )
      Plaintiff,                             )
                                            )          Civil Action No.
      v.                                    )          15-11913-FDS
                                            )
CAROLYN W. COLVIN, Commissioner,            )
Social Security Administration              )
                                            )
      Defendant.                            )
_____)

**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO REVERSE AND**
**DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER**

**SAYLOR, J.**

      This is an appeal of a final decision by the Commissioner of the Social Security Administration denying plaintiff's second application for Supplemental Security Income ("SSI") benefits. Although the Social Security Administration granted plaintiff's subsequent third application for SSI benefits, she seeks to have the earlier decision vacated and remanded to establish an earlier onset date for her disability. She appeals the Commissioner's denial of her second application on the grounds that the Administrative Law Judge's "Step 5" finding and the denial of her application were erroneous. Specifically, she contends that the Administrative Law Judge (1) should have been bound by a prior determination of her residual functional capacity and (2) improperly relied on a vocational witness's testimony.

      Plaintiff has moved to reverse the decision of the Commissioner and defendant has cross-moved to affirm the decision. For the reasons stated below, the decision of the Commissioner will be reversed.

## I.     Procedural History

Ada Mantilla filed her first application for SSI benefits on December 16, 2008. That application was denied on April 14, 2011, and the Appeals Council upheld the denial of benefits on August 25, 2011.

Mantilla's second application for SSI, which is at issue in this case, was filed on September 20, 2011. It alleged a disability onset date of June 1, 2001. That application was denied on February 22, 2012, and again on January 2, 2013, upon rehearing. On January 23, 2013, she requested a hearing, and on October 22, she amended her disability onset date to September 20, 2011. The hearing was held on October 31, 2013. She submitted a post-hearing brief, in which she raised an objection to the hypothetical posed to the vocational expert regarding her residual functional capacity assessment. On December 26, 2013, the ALJ overruled the objection and denied the application.

Mantilla filed a third application, which was ultimately granted. She now appeals the denial of the second application in order to establish an earlier onset date for her disability.

## II.    Background

Ada Mantilla was born on November 4, 1961. She was 49 years old when she filed the present application on September 20, 2011. She has "limited education." (R. at 36). Before filing her application for SSI benefits, Mantilla had worked as a cashier, a clothes hanger, and a substitute cafeteria worker. (R. at 116). After filing for SSI benefits, she reported being able to cook, take care of her four-year-old grandson, and attend to her own personal hygiene. (R. at 27).

### A.     Medical History

In April 2011, the ALJ who handled Mantilla's first SSI application found that she had four severe impairments: chronic knee pain, chronic back pain, depression, and anxiety. (R. at

112). In December 2013, the ALJ who handled her second application also found four severe impairments: osteoarthritis, subjective arthralgias, depression, and anxiety. At that time, the ALJ also found that she had been treated for an ankle impairment, bradycardia, tendinitis, and obsessive-compulsive disorder, but found that those conditions were not severe.

### 1.      Physical Impairments

Mantilla saw her primary-care provider for bilateral knee pain in July 2010, and was given non-narcotic pain medication. (R. at 28). She saw the same doctor in August 2011 for pain in her left ankle; the doctor found that there was tenderness in the ankle, but no swelling, and that she had a full range of motion in the ankle and a normal gait. (*Id.*). In November 2011, she saw a different doctor and reported a history of low back pain and bilateral knee pain. At the time, she was not taking pain medication. (*Id.*). For about three months starting in November 2011, a chiropractor treated her for back, neck, and leg pain. (*Id.*).

Mantilla saw Nurse Practitioner Kristin Proverb in December 2011, reporting that she felt bilateral knee pain and that both of her knees were giving way. (*Id.*). She also reported that she had been seeing a chiropractor regarding aches in her upper body. (*Id.*). Nurse Proverb found that Mantilla had a normal gait and full range of motion in the hips, knees, and ankles, but also that she had a slight effusion on the right knee, "moderate crepitus over the right patella with knee flexion and extension, minimal over the left knee," and "discrete pain with patella compression with weakness of the VMO musculature bilaterally." (R. at 29). She was also found to have "end-stage patellofemoral osteoarthritis of the right knee and moderate osteoarthritis of the patellofemoral of the left knee" on x-rays. (*Id.*). She went to physical therapy three times after that appointment. (*Id.*).

Mantilla saw an orthopedic specialist in October 2012 for knee pain. (*Id.*). At that time, the specialist found tenderness in both knees and slight crepitus on the right knee. (*Id.*). He also

3

found bilateral grind and inhibition. (R. at 30). The results of x-rays "were consistent with patellofemoral arthrosis and osteophystic changes." (*Id.*). She was prescribed medication and referred to physical therapy, which she attended twice. (*Id.*). Follow-up examinations in January and May 2013 continued to show the same results. (*Id.*). At another follow-up examination in July 2013, she had increased tenderness in her left knee and reduced internal rotation of her hips. (*Id.*). She was again referred to physical therapy, which she attended twice. (*Id.*).

###  2.     **Mental Impairments**

In January 2011, Mantilla went to Arbor Counseling for an initial evaluation of her mental status. She was assessed with major depressive disorder with moderate symptoms. (R. at 32). At a follow-up visit in August 2011, it was determined that while she was taking medications she did not show anxiety, depression, or sleep problems, and that her depressive symptoms were stable. (R. at 33). At some point in October 2011, she stopped taking her medications. In November 2011, a registered nurse diagnosed depressive disorder, prescribed medication, and instructed her to continue therapy.

In February 2012, a psychologist again diagnosed depressive disorder with moderate symptoms. At a follow-up examination in April 2012, the psychologist found that the compulsive hand washing she had experienced had decreased and that she was calmer than she had been at her examination in February, but she also reported some panic attacks. (R. at 34). In April 2012, her primary-care provider concluded that she was under a lot of stress and not eating well, which may have contributed to weight loss. She had follow-up appointments in May, June, and July 2012, at which her mental symptoms were stable. At a counselling appointment in July 2012, she displayed fewer symptoms of depression and anxiety, and reported that she was looking for a job. (*Id.*). Her medication for depression and anxiety continued to be adjusted throughout 2012, and her doctor recommended that she exercise.

In June 2013, her primary-care provider concluded that she had situational depression because of problems with her daughters. (*Id.*). A psychiatric nurse practitioner assessed her symptoms as "moderate" in October 2013. (*Id.* at 35). At that time, she reported being able to cook as well as walk to the library and the drugstore. (*Id.* at 34-35).

### B.   Residual Functional Capacity Assessments

The ALJ who handled Mantilla's second application for SSI benefits found that she was able to perform work at a moderate exertion level. (R. at 36). He based that decision on findings that assessment scores concerning her depression ranged from 50 to 55; most of her scores were in the moderate range, and those that were in the severe range were very close to the border of the moderate range. (*Id.*). He took into account her claims of physical pain, but also considered the fact that those claims were subjective, and found her to be not entirely credible. (*Id.*) He also found that she was "limited to routine tasks with no detailed instructions" and "cannot tolerate more than superficial interaction with the public, supervisors, or coworkers." (R. at 28).

In explaining his determination of her Residual Functional Capacity ("RFC"), the ALJ focused on the conservative nature of her treatment for her physical ailments, including the fact that she did not take offered injections for her pain and that she did not regularly attend her scheduled physical therapy sessions. Mantilla missed an appointment for a consultative examination, and it was not rescheduled. (R. at 32). The ALJ gave some weight to the findings of a state agency medical consultant, and little weight to the statement from her chiropractor, because he was not an "acceptable medical source." (R. at 31). The ALJ also disagreed with the ALJ who denied her first application, who had found that her RFC was limited to sedentary work. (R. at 32). The ALJ in the second proceeding chose not to accept that finding for two

reasons: first, it was based on her subjective complaints, rather than objective findings of injury; and second, it related to a different time period than the one at issue in this case.

**III.     Analysis**

    **A.     Standard of Review**

Under § 405(g) of the Social Security Act, this Court may affirm, modify, or reverse the Commissioner's decision, with or without remanding the case for a rehearing. 42 U.S.C. § 405(g). The ALJ's finding on any fact shall be conclusive if it is supported by substantial evidence, and must be upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion," even if the record could justify a different conclusion. *Rodriguez v. Sec'y of Health and Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981); *see also Evangelista v. Sec'y of Health and Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987). Moreover, "the responsibility for weighing conflicting evidence, where reasonable minds could differ as to the outcome, falls on the Commissioner and his designee, the ALJ. It does not fall on the reviewing Court." *Seavey v. Barnhart*, 276 F.3d 1, 10 (1st Cir. 2001). In applying the "substantial evidence" standard, the Court must bear in mind that it is the province of the ALJ, not the courts, to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts of evidence. *Ortiz v. Sec'y of Health and Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). Reversal is warranted only if the ALJ committed a legal or factual error in evaluating plaintiff's claim, or if the record contains no "evidence rationally adequate . . . to justify the conclusion" of the ALJ. *Roman-Roman v. Commissioner of Social Security*, 114 Fed. Appx. 410, 411 (1st Cir. 2004); *see also Manso-Pizarro v. Sec'y of Health and Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996).

### B.     Standard for Entitlement to Supplemental Security Income Benefits

In order to qualify for SSI benefits, a claimant must demonstrate that he or she is "disabled" within the meaning of the Social Security Act.  The Social Security Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment must be severe enough to prevent the claimant from performing not only his past work, but also any substantial gainful work existing in the national economy.  42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 401.1560(c)(1).

An applicant's impairment is evaluated under a five-step analysis set forth in the regulations promulgated under the statute.  20 C.F.R. § 404.1520. The First Circuit has described the analytical sequence as follows:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.
>
> Second, does the claimant have a 'severe impairment' . . . mean[ing] an impairment 'which significantly limits his or her mental capacity to perform basic work-related functions[?]' If the claimant does not have an impairment of at least this degree of severity, he is automatically considered not disabled.
>
> Third, does the claimant have an impairment equivalent to a specific list of impairments contained in Appendix 1 [of the Social Security regulation]? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled . . . . If, however, his ability to perform basic work-related functions is impaired significantly (test 2) but there is no 'Appendix 1' impairment (test 3), the [ALJ] goes on to ask the fourth question:
>
> Fourth, does the claimant's impairment prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.
>
> Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so, he is disabled; if not, he is not disabled.

*Goodermote v. Sec'y of Health and Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982).

The burden of proof is on the applicant as to the first four inquiries. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the [ALJ] may require."). At the fifth step of the analysis, the burden shifts to the Commissioner to show that the claimant is capable of performing jobs available in the national economy. *See Goodermote*, 690 F.2d at 7. In making that determination, the ALJ must assess the claimant's residual functional capacity in combination with vocational factors, including the claimant's age, education, and work experience. 20 C.F.R. § 404.1560(c).

### C. The Findings of the Second ALJ

In evaluating the evidence, the ALJ in the second proceeding conducted the five-part analysis called for by Social Security Act regulations. First, the ALJ concluded that plaintiff had not engaged in substantial gainful activity since September 20, 2011, the alleged onset date. (R. at 26). Second, the ALJ determined that she had the following severe impairments: (1) osteoarthritis, (2) subjective arthralgias, (3) depression, and (4) anxiety. (*Id.*). Third, the ALJ concluded that plaintiff did not have an impairment or combination of impairments that met or medically equalled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*).

At the fourth step, the ALJ concluded that plaintiff had the RFC to perform medium work as defined in 20 CFR 416.967(c), except that she was limited to routine tasks with no detailed instructions and could not tolerate more than superficial interaction with the public, supervisors, or coworkers. (R. at 28). The ALJ found that she could not perform any past relevant work. (R. at 36).

Finally, at the fifth step, the ALJ concluded that jobs that plaintiff can perform exist in the national economy in significant numbers. (R. at 36). The ALJ expressly relied on the

vocational expert's testimony at the hearing that an individual of her age, with her education, work experience, and residual functional capacity, would be able to work as a night janitor, office cleaner, or hand packager, and that jobs exist in each of these categories in the national economy in significant numbers. (R. at 37). The ALJ stated that the vocational expert's testimony was consistent with the information provided in the Dictionary of Occupational Titles concerning the requirements of those jobs. (*Id.*). The ALJ also asked the vocational expert whether there would be jobs that she could perform even if her RFC only allowed her to perform light work, rather than medium work. (*Id.*). The vocational expert testified that even under that circumstance, there would be jobs that exist in substantial numbers in the national economy that plaintiff could perform, such as a laundry classifier, price marker, or inserter. (*Id.*). The ALJ thus concluded that plaintiff was not disabled under section 1614(a)(3)(A) of the Social Security Act. (R. at 38).

### D. Mantilla's Objections

Plaintiff raises two main objections to the decision of the ALJ: she contends that the ALJ erred in not following the RFC decision from her prior case, and that the ALJ improperly relied on the the testimony of the vocational expert. Specifically, she contends that the ALJ's RFC assessment was not based on evidence or evaluations by physicians or other expert medical sources, and that the decision improperly rejected the assessment of her chiropractor.

#### 1. Whether the ALJ Should Have Used the RFC That Was Determined in the First Proceeding

In plaintiff's first application, decided on April 5, 2011, the ALJ made the following findings:

> The residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except she can perform postural movements occasionally; she can have limited social interaction with coworkers, the general public and supervisors; she is able to perform simple, unskilled work and she can maintain attention and

9

concentration on tasks for two-hour increments throughout an eight hour work day.

(R. at 114).[1]  After the Appeals Council upheld that finding on August 25, 2011, plaintiff reapplied for SSI benefits on September 20, 2011.  The ALJ in her second application, however, found that her RFC would allow her to perform "medium work as defined in 20 CFR 416.967(c) except that she is limited to routine tasks with no detailed instructions" and further limited her to jobs with, at most, "superficial interaction with the public, supervisors, or coworkers."  (R. at 28).  Plaintiff contends that the ALJ in the second proceeding should have been bound by the RFC finding in her initial proceeding.

The crucial question in determining whether the ALJ in the second proceeding was bound by the RFC finding in the first proceeding is whether there was improvement in plaintiff's condition between the two decisions.  *Lively v. Sec'y of Health and Human Servs.*, 820 F.2d 1391, 1392 (4th Cir. 1987).  Plaintiff contends that the ALJ in the second proceeding did not make a finding as to any improvements in her condition, and was therefore bound by the decision of the ALJ in the first proceeding.  Although the First Circuit has not decided any cases on this basis, there are several cases from other circuits that speak to the issue.  *See Rucker v. Chater*, 92 F.3d 492 (7th Cir. 1996)*; Chavez v. Bowen*, 844 F.2d 691 (9th Cir. 1988)*; Lively v. Sec'y of Health and Human Servs.*, 820 F.2d 1391 (4th Cir. 1987); *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997).  One important factor in those cases is the length of the time between the two applications filed by the claimants.  In cases where the amount of time between the two applications was short, courts have generally found the subsequent proceeding was

---

[1] The ALJ's explanation of the RFC finding was based on statements that plaintiff could perform light work, and did not include any explanation as to why she was limited to sedentary work.  (R. at 115-16).  Nevertheless, the ALJ used a "sedentary" classification both in the official statement of her RFC and in determining whether there were jobs in the national economy that she could perform, and therefore that determination will be followed.

10

subject to some degree of issue preclusion. *See Drummond*, 126 F.3d at 842 (for a claimant who submitted their second application two weeks after the first was denied, "absent evidence of an improvement in claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ"); *Chavez* 844 F.2d at 694 (finding that, where there were two months between the first RFC and submission of second application, the first RFC was "entitled to some res judicata consideration in subsequent proceedings"). On the other hand, where there was a longer period between the initial RFC finding and the filing of the subsequent benefits application, courts have more often found that the previous finding was not entitled to preclusive effect. *See Rucker*, 92 F.3d at 495 (finding that, for a claimant with a two-year gap between the first RFC finding and the subsequent application, the previous RFC finding was not conclusive evidence of her residual functional capacity at a later date).

  Plaintiff filed her second application for SSI benefits less than six months after the RFC finding was made in her first application, and less than a month after that finding was upheld by the Appeals Council. Because of the relatively short amount of time between the final agency action in her first case and the filing of her second application, this case falls into the category of situations in which the initial RFC finding is "entitled to some res judicata consideration." *Chavez*, 844 F.2d at 694. Here, the second ALJ did not find improvement in plaintiff's condition; rather, the ALJ determined that the first ALJ was mistaken in determining that plaintiff's RFC limited her to sedentary work with other conditions. (R. at 32). However, according to 42 U.S.C. § 405(h), findings of fact and decisions made by the commissioner, such as the one made by the ALJ in plaintiff's first case, are not reviewable except as provided in that statute. Because the statute does not allow for one ALJ, in considering a subsequent application by the same claimant, simply to overturn the decision of the first ALJ, the second ALJ erred in

11

reviewing the previous decision and finding that the first ALJ was mistaken.  Barring an appeal to the district court, plaintiff's first RFC finding was final once the Appeals Council upheld the ALJ's decision, and a later ALJ could not overturn that decision.  The second ALJ was bound by the initial decision unless he made a specific finding as to an improvement in plaintiff's condition.  Therefore, the ALJ's decision as to plaintiff's RFC will be reversed.

> **2.      Whether the Vocational Expert's Testimony Was Unreliable Because It Was Based on a Hypothetical That Did Not Encompass All of Plaintiff's Limitations.**

Plaintiff further contends that the ALJ in the second proceeding did not follow the appropriate procedures and standards in determining her RFC, and that because the ALJ erred in determining her RFC, the testimony of the vocational witness was not reliable.  She contends that the ALJ erred in failing to rely on RFC assessments by physicians and in rejecting the RFC assessment of her chiropractor.  She contends that the hypotheticals posed to the vocational witness did not encompass her full range of limitations and cannot support a finding that she is not disabled.

For the reasons set forth above, unless the ALJ in the second proceeding found that there had been improvement since the decision on her first application was made, he was required to follow the RFC finding of the first ALJ.  Because the ALJ found that plaintiff was limited to sedentary work with additional limitations, and the second ALJ did not specifically find any improvement, the second ALJ should have made an RFC finding consistent with the finding from the first proceeding.  Because the hypotheticals posed to the vocational witness were based on the erroneous RFC, the responses to those questions are not reliable evidence as to whether plaintiff would have been eligible for SSI benefits at the time of her second application.

Plaintiff also contends that the ALJ erred in not relying on an interpretation of the medical data by a physician or other expert medical source in determining her RFC.  Defendant

argues that the RFC determination was made "in large part" based on evidence and testimony that do not constitute "raw medical data," and that therefore, the decision should be upheld. (Def. Motion to Affirm at 11). Defendant also argues that the ALJ was entitled to make the RFC determination because the medical evidence in the record made it clear even to someone without medical training that plaintiff's limitations were not severe and did not significantly restrict her ability to work. (*Id.* at 11-12).

In general, an ALJ is "not qualified to interpret raw medical data in functional terms." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999). However, when the evidence presented to the ALJ clearly shows little physical limitation to the claimant, the ALJ may rely on the lack of evidence to make a "common-sense" judgment about the claimant's RFC. *Manso-Pizarro v. Sec'y of Health and Human Servs.*, 76 F.3d 15, 17 (1st Cir. 1996). That exception, however, is limited. *Gordils v. Sec'y of Health and Human Servs.*, 921 F.2d 327, 329 (1st Cir. 1990). The record may show some small amount of physical impairment to the plaintiff, but it must be limited; for example, in *Gordils*, the court stated that it would be "troubled" if an ALJ concluded that a claimant could perform light work despite a physician's finding that the claimant had a "weaker back." *Id.*

Here, the medical evidence was sufficiently complex that the ALJ should have based his decision on RFC findings by a physician or other expert medical source. The findings made by Nurse Proverb in 2011 included several physical conditions that the ALJ was not qualified to interpret when determining her RFC, including crepitus, weakness of the VMO musculature, and patellofemoral osteoarthritis. In addition, the findings of the orthopedic specialist that plaintiff saw in October 2012 also included medical data that the ALJ was not qualified to interpret, such as bilateral grind and inhibition in the knees, patellofemoral arthrosis, and osteophytic changes.

Those findings are sufficiently technical that it is not appropriate for an ALJ, as a layperson, to interpret those findings in determining a claimant's RFC.

Plaintiff further contends that the ALJ erred in giving little weight to her chiropractor's assessment. Defendant contends that the ALJ was not required to give any weight to the chiropractor's assessment, because a chiropractor is not an "acceptable medical source" under 20 C.F.R. § 404.1513. Because a chiropractor is not an "acceptable medical source" under 20 C.F.R. § 404.1513, their opinions do not have to be given controlling weight, at least if they are not supported by objective evidence. *See Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) (stating that the weight given to chiropractors' opinions depends on whether they are supported by objective evidence, and that without evidence they do not have controlling weight); *Hartranft v. Apfel*, 181 F.3d 358, 361 (3rd Cir. 1999) (holding that although chiropractors' opinions can be considered by the ALJ, they cannot be the foundation for a finding of disability); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997) ("under the current regulations, the ALJ has the discretion to determine the appropriate weight to accord a chiropractor's opinion based on all evidence in the record since a chiropractor is not a medical source").

Here, the chiropractor's assessment was allegedly based on diagnostic imaging of plaintiff's back; those images, however, are not in the record. Moreover, the chiropractor's findings were presented as a checklist without any explanation. When a chiropractor does not give reasons to support his or her opinion, the ALJ is not required to give it controlling weight. *Burdette v. Apfel*, 2000 WL 1371110, at *1 (8th Cir. 2000). *See also Berrios Lopez v. Sec'y of Health and Human Servs.*, 951 F.2d 427, 431 (1st Cir. 1991) (reports that "contain little more than brief conclusory statements or the mere checking of boxes . . . are entitled to relatively little weight."). The ALJ did not err in giving relatively little weight to the chiropractor's findings.

Plaintiff further contends that because the ALJ erroneously determined her RFC, he also erred in relying on the testimony of the vocational witness, whose testimony was based on that RFC. It appears from the record that the ALJ questioned the vocational witness as to whether there were jobs in the national and local economy for people with both a medium functional capacity and a light functional capacity, as well as plaintiff's additional limitations. Although the witness found that there were some jobs available to people with the ability to perform "light" work subject to her other limitations, it is unclear from the record to what extent the ALJ relied on that testimony, rather than on the testimony regarding the "medium" functional capacity, in finding that she was not disabled. In addition, the ALJ did not ask the vocational witness any questions regarding the availability of jobs in the "sedentary" category that would also meet plaintiff's additional limitations. Because the ALJ did not follow the appropriate procedures for determining RFC, and because the vocational witness responded to questions based on this inappropriately determined RFC, the case will be remanded for further proceedings consistent with this order. The ALJ's final determination will be vacated and the case will be remanded for further proceedings consistent with this memorandum.

## IV.    Conclusion

For the reasons stated herein, plaintiff's motion to reverse will be GRANTED and defendant's motion to affirm will be DENIED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  July 13, 2016